UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 3:22-cr-00098 |
| CHRISTOPHER GASKIN | |

### ORDER ON MOTION TO SUPPRESS AND TO DISMISS

Christopher Gaskin ("Gaskin") is charged with possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1)[1], and possession with intent to distribute crack cocaine in violation of 21 U.S.C. §§ 841(a) and 841(b)(1)(C). *See* Indictment, Doc. No. 18. Most, if not all, of the evidence against Mr. Gaskin stems from a traffic stop.

Mr. Gaskin challenges the legal validity of the traffic stop and moves to suppress all the evidence against him, namely: (1) the firearm; (2) the contraband; and (3) his statements made during the stop. *See* Def.'s Mot. to Suppress ("Def.'s Mot."), Doc. No. 78; Def.'s Supp. Mot. to Suppress, Doc. No. 88.[2] Further, Mr. Gaskin maintains that this case should be dismissed because the government failed to preserve the vehicle Mr. Gaskin was driving. *See* Def.'s Mot., Doc. No. 78. The government opposes Mr. Gaskin's motions, arguing that the evidence was lawfully obtained and there is no basis to dismiss the indictment. *See* Gov't's Mem. in Opp. to Def.'s Mot., Doc. No. 82, at 3–4. I held an evidentiary hearing on June 5, 2023, *see* Min. Entry,

---

[1] The indictment also charges Mr. Gaskin with 18 U.S.C. § 924(e), which could subject Mr. Gaskin to a mandatory minimum under the Armed Career Criminal Act. At oral argument on June 12, 2023, the government indicated that they will no longer be pursuing that charge.

[2] Prior to Mr. Gaskin's current counsel being appointed, Mr. Gaskin filed two *pro se* motions related to dismissal and suppression. *See* Def.'s Pro Se Mot. Demand for Dismissal of Counsel, Suppression, and Dismissal, Doc. No. 53; Def.'s Emergency Mot. to Dismiss All Charges and Mot. for Immediate Release, Doc. No. 59. Those motions are **denied** as moot in light of the renewed motion to suppress and dismiss, doc. no. 78.

Doc. No. 84, and oral argument on the motions on June 12, 2023, *see* Min. Entry, doc. no. 90. For the reasons that follow, Mr. Gaskin's motions, doc. nos. 78, 88, are **denied**.

I.   **FACTUAL BACKGROUND**

The following facts are drawn from the exhibits admitted in connection with the evidentiary hearing, including the incident report, the body camera footage of the officers on the scene, and the testimony presented at the evidentiary hearing. Based on that record, I make the following findings of fact:

On January 1, 2022, Matthew Steinmetz ("Steinmetz"), Nicholas Ortiz ("Ortiz") and Nikki Iannace ("Iannace"), Hartford Police Department ("HPD") officers, were on a directed patrol on the north side of Hartford, Connecticut. Those officers are normally assigned to the south end of Hartford, but on this day—New Year's Day—they were part of a surge to conduct proactive enforcement on the north end of Hartford. Officers Steinmetz, Ortiz and Iannace were in an unmarked car, though each officer wore clearly visible and recognizable HPD uniforms with police patches, badges, and body cameras on their police uniforms.

At approximately 1:14pm, Officers Steinmetz and Ortiz, who were seated in the front seats of the unmarked vehicle, observed a 2001 Infiniti I30 ("the Infiniti"), stopped along the west curb of Magnolia Street. As the officers traveled south along Magnolia Street, Officers Steinmetz and Ortiz saw the Infiniti pull off the curb line into the lane of travel. The operator, later identified as Mr. Gaskin, failed to use a turn signal to enter the lane of travel. Officers Steinmetz and Ortiz also noticed that the Infiniti had dark tint material on the windows without the requisite stickers[3] for those windows. Further, a check of the Department of Motor Vehicles

---

[3] Pursuant to Connecticut General Statutes § 14-99g(e), vehicles with windows that have been "tinted or darkened with any tinted material after factory delivery" must "have affixed to the lower left corner of each such window a sticker legible from outside the vehicle which indicates the sticker registration number, a certification of

("DMV") records revealed that the license plates affixed to the Infiniti were registered to a black Mazda. Officers Steinmetz and Ortiz decided to pull over the Infiniti.

Officer Steinmetz radioed that they were pulling over the Infiniti. *Id.* Officers Barron and Spencer[4] were in a marked police car nearby and decided to assist with the stop. They also wore clearly visible and recognizable HPD uniforms, with police patches, badges, and body cameras on their police uniforms.

Officer Barron engaged the police lights on his vehicle and pulled over the Infiniti in the area of 88 Irving Street. Officer Steinmetz parked his unmarked police vehicle in the front area of the Infiniti, while Officer Barron parked his marked police vehicle behind the Infiniti. Another vehicle was parked to the side of Mr. Gaskin's car, effectively boxing him in. As the five officers began to exit their vehicles, they noticed that Mr. Gaskin was exiting the driver's side door. No officer had given Mr. Gaskin a command to exit his vehicle.

Upon making contact with Mr. Gaskin, Officer Barron immediately turned him around and began a pat down of his person for weapons. Simultaneously, Officer Barron asked Mr. Gaskin if he had anything on him. Mr. Gaskin indicated that he was carrying a firearm and was immediately handcuffed. The firearm was retrieved from Mr. Gaskin's waistband without incident at 1:18pm, which is approximately 45 seconds after the officers got out of their vehicles.

Officer Barron stepped away from the scene to secure the weapon. Officer Steinmetz stayed with Mr. Gaskin and continued to search him. Officer Steinmetz located $105 in Mr. Gaskin's front pants pocket and his wallet in his back pocket. *Id.* In Mr. Gaskin's front sweatshirt pocket, Officer Steinmetz found a clear plastic baggie containing (1) a white rock-like

---

compliance with the provisions of this section, and such other information as the Commissioner of Motor Vehicles deems appropriate."
4        The first names of these officers are not provided in the record.

substance (approximately 6.7 grams), and (2) another clear plastic baggie with 35 small purple vials each containing a white rock-like substance. As Officer Steinmetz was searching Mr. Gaskin, Mr. Gaskin inquired about the reason for the stop. The conversation was as follows:

> **Mr. Gaskin**: What made you pull me over?
>
> **Officer Steinmetz**: You didn't use a signal when you pulled out and then the windows were all tinted up.
>
> (*inaudible*)
>
> **Mr. Gaskin**: I used a signal.
>
> **Officer Steinmetz**: No, you did not. It was just a motor vehicle stop.
>
> (*inaudible*)
>
> **Officer Steinmetz**: What do you think someone snitched you out?
>
> **Mr. Gaskin**: I know somebody did snitched me out. I'm just trying to figure out who.
>
> **Officer Steinmetz**: Nah, nobody did. Hey, nobody did.
>
> (*Officer Steinmetz continues searching Mr. Gaskin*)
>
> **Officer Steinmetz**: Do you have anything else on you?
>
> **Mr. Gaskin**: No.

At this point, Officer Spencer approaches Mr. Gaskin. The following conversation occurs:

> **Officer Spencer**: What's your name, bro?
>
> **Mr. Gaskin**: Gaskin.
>
> **Officer Spencer**: Did you just do time?
>
> **Mr. Gaskin**: Yea.
>
> **Officer Spencer**: You just got out, right?

>   *(Mr. Gaskin nods)*
>
>   **Officer Spencer**: I'm not trying to be all in your shit though, what they call you out here?
>
>   *(inaudible)*
>
>   **Officer Spencer**: Yea they do.

During Mr. Gaskin's conversation with Officer Spencer, Officer Steinmetz continues searching him. At one point, Officer Steinmetz pats down Mr. Gaskin's groin area. The following conversation occurs:

>   **Mr. Gaskin**: Don't do that … take my word, I don't have it.
>
>   **Officer Steinmetz**: Yeah, I just gotta check.
>
>   **Mr. Gaskin**: But not my nuts. You see I don't put drugs on my nuts. You see the drugs is in my ….

At the conclusion of this conversation, Officer Barron walks over to Mr. Gaskin. He asks Mr. Gaskin if he has been read his *Miranda* rights yet, to which Mr. Gaskin answers in the negative. Officer Barron then reads Mr. Gaskin his *Miranda* rights at approximately 1:20pm. At 1:24pm, Officer Iannace received confirmation that Mr. Gaskin was a convicted felon.

By this point, bystanders have gathered near Mr. Gaskin's vehicle. In particular, a woman identified as Monazha Lacy ("Lacy") spoke with the officers. She requested that the Infiniti not be towed. Mr. Gaskin, overhearing that conversation, told Officer Barron, "don't take it," meaning the Infiniti. *Id.* A short time later, Officer Steinmetz asked Mr. Gaskin, "I don't know if I can work this out, but if I can, do you want to give your car to [Ms. Lacy]?" *Id.* Mr. Gaskin replied, "Yes, please."

## II.     DISCUSSION

### A.     Motion to Suppress Firearm and Drugs

5

First, Mr. Gaskin seeks to suppress "the gun and other illegal items" found on his person during the January 1, 2022 traffic stop. *See* Def. Mot., Doc. No. 78, at 1. I analyze the legality of each relevant point of the traffic stop.

### 1. *Was the initial basis for the traffic stop legal?*

The Fourth Amendment provides, in relevant part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. amend. IV. The temporary detention of an individual during a traffic stop is subject to limitation under the Fourth Amendment as a "seizure" of the person. *Holeman v. City of New London,* 425 F.3d 184, 189 (2d Cir. 2005) (quoting *Whren v. United States*, 517 U.S. 806, 809–10 (1996)). To effect a lawful traffic stop, "[t]he Fourth Amendment requires that an officer making a [traffic] stop have probable cause or reasonable suspicion that the person stopped has committed a traffic violation or is otherwise engaged in or about to be engaged in criminal activity." *Holeman*, 425 F.3d at 189.

"Probable cause arises when the police reasonably believe that 'an offense has been or is being committed.'" *United States v. Scopo*, 19 F.3d 777, 781 (1994) (quoting *United States v. Cruz*, 834 F.2d 47, 50 (2d Cir. 1987)). The standard for reasonable suspicion is less demanding than that of probable cause. *United States v. Singletary*, 798 F.3d 55, 60 (2d Cir. 2015). Still, reasonable suspicion requires more than a "hunch" to justify an investigatory stop. *Id.* at 59 (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)). "It demands specific and articulable facts which, taken together with rational inferences from those facts, provide detaining officers with a particularized and objective basis for suspecting legal wrongdoing." *Singletary*, 798 F.3d at 59 (cleaned up).

The government argues that the officers had a reasonable basis to suspect that Mr. Gaskin committed a traffic infraction because Mr. Gaskin failed to signal[5], his windows appeared to be illegally tinted[6], and his license plate was registered to a different vehicle[7], all in violation of Connecticut law. *See* Incident Report, Doc. No. 78-1, at 3. For the traffic stop to have been lawful, the officers only needed reasonable suspicion that Mr. Gaskin committed *one* of those infractions.

Evidence of the third infraction, improper use of a marker plate, is most apparent. The HPD audio log confirms that the officers ran Mr. Gaskin's license plates against the DMV database prior to Mr. Gaskin being pulled over. *See* Audio Log Details, Gov't Ex. 12. The log confirms that the officers learned that the license plates affixed to the Infiniti were registered to a different vehicle, a black Mazda. *Id.* Connecticut General Statutes § 14-147(c) prohibits improper use of license plates. In light of the officers' knowledge that the license plate on the Infiniti was registered to another car, the officers had "specific and articulable facts which, taken together with rational inferences from those facts" provided those officers with a "particularized and objective basis for suspecting legal wrongdoing." *Singletary*, 798 F.3d at 57.

---

[5] Pursuant to Connecticut General Statutes § 14-242(a), "[n]o person shall turn a vehicle at an intersection unless the vehicle is in a proper position on the highway as required by § 14-241, or turn a vehicle to enter a private road or driveway or otherwise turn a vehicle from a direct course or move right or left upon a highway unless such movement can be made with reasonable safety. No person shall so turn any vehicle without giving an appropriate signal in the manner provided in § 14-244."

[6] Pursuant to Connecticut General Statutes § 14-99g(g), "[a]ny person owning a vehicle having a window which has been tinted or darkened with any tinted material after factory delivery, shall present such vehicle to the Department of Motor Vehicles, by July 1, 1996, to receive a sticker for any tinted or darkened window to indicate such tinting or darkening is in compliance with this section. Any person operating a motor vehicle, on or after July 1, 1996, in violation of this subsection shall be deemed to have committed an infraction."

[7] Pursuant to Connecticut General Statutes § 14-147(c), "[n]o person shall use any motor vehicle registration or operator's license other than the one issued to him by the commissioner, except as provided in section 14-18; and no person shall use a motor vehicle registration on any motor vehicle other than that for which such registration has been issued. Any person who violates any provision of this subsection shall be fined not more than one hundred dollars or imprisoned not more than thirty days or both."

Because the officers had at least reasonable suspicion—and likely probable cause— to believe that Mr. Gaskin violated at least *one* traffic violation, the decision to stop him was legal. *See United States v. Stewart*, 551 F.3d 187, 192 (2d Cir. 2009) ("[T]raffic stops are reasonable when they arise from the reasonable suspicion of a traffic violation."); *Scopo*, 19 F.3d at 781 ("When an officer observes a traffic offense—however minor—he has probable cause to stop the driver of the vehicle.") (cleaned up).[8] It is irrelevant that Mr. Gaskin suspects that the stop was pretextual. *See United States v. Gomez*, 877 F.3d 76, 93 n.27 (2d Cir. 2017) (noting that, "a pretextual stop and reasonable suspicion are not mutually exclusive; an officer may conduct a pretextual stop based on a traffic violation…."); *see also United States v. Restrepo*, 890 F. Supp. 180, 192 (E.D.N.Y. 1995) (traffic stop permissible if valid basis, even if pretextual). For those reasons, I find that the initial basis for the stop was legal.

2. *Was the gun obtained legally?*

"Before [an officer] places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so." *Sibron v. New York*, 392 U.S. 40, 64 (1968). In the context of an investigatory stop, an officer may conduct a "pat-down, or frisk, of a detainee's outer clothing for the presence of a weapon as a protective measure if the officer has an articulable suspicion that the individual is armed and dangerous." *See United States v. Lopez*, 432 F. Supp. 3d 99, 107 (D. Conn. 2020) (citing *Terry*, 392 U.S. at 28); *see also Arizona v. Johnson*, 555 U.S. 323, 326–27 (2009) (pat-down of passenger during traffic stop justified if officer has reasonable basis to think person stopped is armed and dangerous).

---

[8] Having concluded that there was reasonable suspicion that Mr. Gaskin violated the statute prohibiting misuse of plates, I need not reach the government's remaining arguments that officers had reasonable suspicion to conduct a *Terry* stop on the basis of the other two traffic infractions.

Reasonable suspicion is based on the "totality of the circumstances" as seen "through the eyes of a reasonable and cautious police officer on the scene." *United States v. Bailey*, 743 F.3d 322, 333 (2d Cir. 2014) (quoting *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000)). "A mosaic of factors can contribute to a basis for reasonable suspicion, including, among other things, the suspect's behavior, the context of the stop, and the crime rate in the area." *United States v. Weaver*, 9 F.4th 129, 140 (2d Cir. 2021) (cleaned up). "An officer's action must be justified at its inception." *Id*. (cleaned up). As such, "when reviewing the constitutionality of a frisk for weapons, the [c]ourt must examine the facts that preceded the frisk." *Id.*

As evidenced by the body camera footage, Mr. Gaskin was frisked by Officer Barron almost immediately after he was pulled over. Prior to that moment, several events occurred. First, Mr. Gaskin was driving a vehicle with improper plates and tinted windows. Both facts suggest that Mr. Gaskin was trying to evade detection. Of course, those facts alone would not rise to a level of reasonable suspicion because those who seek to evade detection are not necessarily armed and dangerous. As such, it is just one factor of my analysis. Second, Mr. Gaskin was pulled over in a high-crime area. Although not dispositive, encounters in a "high crime area" are "among the relevant contextual considerations" in reasonable suspicion analysis. *United States v. Alleyne*, 573 F. Supp. 3d 861, 870 n.14 (E.D.N.Y. 2021). Third, and most significant to Officer Steinmetz, Mr. Gaskin exited his vehicle before being ordered to do so. Per Officer Steinmetz, such behavior is "very concerning safety-wise," *see* Hr'g Transcript, Doc. No. 86, at 107:13–107:16, because "it means that [the detainee is] going to either flee or [the detainee is] going to fight with the officers." *Id.* at 45:05–45:09. From that, Officer Steinmetz concluded that Mr. Gaskin "could be dangerous." *Id.* at 65:07–65:15.[9]

---

[9] To clarify, Officer Barron conducted the frisk. But only Officer Steinmetz testified at the evidentiary hearing. Further, Officer Steinmetz is the author of the Incident Report.

Considering all those factors together, I find that there was reasonable suspicion to believe that Mr. Gaskin was armed and dangerous.[10] *See Phaneuf v. Fraikin*, 448 F.3d 591, 599 (2d Cir. 2006) ("Under certain circumstances, the manner in which a person acts when confronted by law enforcement officials can be grounds for raising a reasonable suspicion to conduct a limited search …."). Therefore, the officers' discovery of the gun pursuant to the lawful *Terry*-frisk of Mr. Gaskin was legal.

        3.      *Was the contraband obtained legally?*

           a)      *Terry*-Frisk

An officer's seizure of contraband during a *Terry* frisk is constitutional if "a police officer lawfully pats down [an individual's] *outer clothing* and feels an object whose contour or mass makes its identity *immediately apparent*…." *Minnesota v. Dickerson*, 508 U.S. 366, 373, 375 (1993) (emphasis added). A search exceeds the proper scope if "the incriminating character of [an item is] not immediately apparent" but is discovered "only as a result of a further search…." *Id.* at 379.

After the firearm was retrieved, Officer Steinmetz continued to search Mr. Gaskin's person ("second search"). By that point, Mr. Gaskin was still in handcuffs. At least five officers were on the scene, with more arriving. The officers applauded Mr. Gaskin for being compliant with their orders and referred to him as "a gentleman." Arguably then, the justification for the *Terry*-frisk—*i.e.,* that Mr. Gaskin was armed and dangerous— ceased by that point. *See Dickerson*, 508 U.S. at 373 ("The purpose of this limited search is not to discover evidence of

---

[10] The Incident Report indicates that Mr. Gaskin "hastily existed the vehicle," "appeared extremely nervous and was looking back and forth in all directions searching for an avenue of escape." *See* Incident Report, Doc. No. 78-1, at 3. I do not make that finding of fact because the body camera footage does not support those assertions. In fact, Officer Steinmetz testified that Mr. Gaskin cooperated throughout the entire process, including the period when he was initially approached. Hr'g Transcript, Doc. No. 86, at 65:16–65:18; 66:22–66:24.

crime, but to allow the officer to pursue his investigation without fear of violence...."); *Terry*, 392 U.S. at 27 (Because a *Terry* frisk requires reasonable suspicion that the person is armed and dangerous, "the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."). But even if the justification for a frisk was still present, the record demonstrates that the second search exceeded the scope of a constitutional *Terry*-frisk.

The body camera footage shows Officer Steinmetz continuously patting Mr. Gaskin down and rummaging through his pockets. Yet, there is no evidence that Officer Steinmetz, in feeling the plastic bag or cash on Mr. Gaskin's person, believed either object to be a weapon.[11] Nor is it apparent that a reasonable officer at the scene would have suspected those objects to be weapons given their vastly different shapes and textures. To illustrate my point, a screenshot of the plastic bag in Mr. Gaskin's sweatshirt front pocket is below.



---

[11] Similarly, there is no evidence that Officer Steinmetz believed that the objects were narcotics. The government argued at oral argument that the drugs were lawfully seized pursuant to the plain view exception. "Under [the plain view] doctrine, if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *United States v. Miller*, 430 F.3d 93, 102 (2d Cir. 2005) (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993)).
    I do not find as a matter of fact that the incriminating character of the drugs was immediately apparent. One could argue that the plastic bag was in plain view. But a plastic bag is generally only incriminating if its contents are incriminating. Without any claim that the bag's contents were in plain view, the plastic bag was simply just a bag. Unsurprisingly then, Officer Steinmetz did not testify, nor did he include in his report, that he suspected the objects in Mr. Gaskin's pockets were narcotics.

*See* Screenshot of Narcotics in Pocket, Gov't Ex. 7.

As evidenced by the photograph, the plastic bag is not hanging out of Mr. Gaskin's pocket. Further, the plastic bag does not appear to be a solid bulge, resembling the shape of a weapon. Although I can appreciate that police officers do not have the benefit of hindsight when forced to make split-second decisions, I cannot conclude that a reasonable officer on the scene would have reasonably believed the objects in Mr. Gaskin's pockets to be a weapon, especially when not even Officer Steinmetz testified to those facts. While *Terry* entitled Officer Steinmetz to place his hands on Mr. Gaskin's person and to feel the lumps in his pockets, the continued exploration of his pockets was unrelated to the sole justification for the search under *Terry*. As such, the second search cannot be classified as a limited, protective *Terry*-frisk.

          b)       Search-Incident-to-Arrest Exception

A lawful custodial arrest permits a police officer to conduct a warrantless search of "the arrestee's person and the area within his immediate control." *Arizona v. Gant*, 556 U.S. 332, 339 (2009) (cleaned up); *United States v. Robinson*, 414 U.S. 218, 235 (1973) (when police effect a lawful arrest, they may conduct a full search of the arrestee's person without any additional justification). This is known as the search-incident-to-arrest exception.

Initially, the second search was justified by the officers as a search incident to arrest. If so, the logical predicate is that there was a lawful basis to arrest Mr. Gaskin. It is not clear if Mr. Gaskin was under formal arrest at the time of the second search. Nevertheless, the fact that Mr. Gaskin was not under arrest prior to the search "does not alter its constitutionality under Second Circuit precedent so long as probable cause to arrest existed at the time of the search." *Evans v. Solomon*, 681 F. Supp. 2d 233, 248 (E.D.N.Y. 2010); *see also United States v. Wilson*, 94 F. App'x. 14, 17 (2d Cir. 2004) ("Once probable cause was established, it is irrelevant whether the

officers' searches of [the defendant] occurred prior or subsequent to his arrest."). The critical question, therefore, is whether there was probable cause to arrest Mr. Gaskin at the time of the second search.

The Incident Report suggests that Mr. Gaskin was arrested for illegally possessing a firearm.[12] *See* Incident Report, Doc. No. 78-1, at 4. To arrest Mr. Gaskin for unlawful possession then, there needed to have been some evidence indicating the probability that Mr. Gaskin was not licensed to possess a firearm. Absent such information, there could not have been probable cause to arrest Mr. Gaskin. *See, e.g., Soukaneh v. Andrzejewski*, 2021 WL 3475700, at *4 (D. Conn. Aug. 6, 2021).

Here, Mr. Gaskin avers that he was never asked whether the gun retrieved from his waistband was carried legally, or illegally. Although the Incident Report states that Officer Barron asked Mr. Gaskin if he had a valid pistol permit, the body camera footage does not support that assertion. Moreover, Mr. Gaskin's driver's license was run *after* the second search commenced, as the government conceded during oral argument. Thus, his status as a convicted felon was uncertain. Consequently, by the time of the second search, the officers did not have enough facts to support probable cause. That is because an individual cannot be presumed to be carrying a firearm unlawfully simply because of their possession of a firearm. *See New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2122 (2022) ("The Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home."); *Adams v. Williams*, 407 U.S. 143, 160 (1972) (Marshall, J., dissenting) ("Since Connecticut has not made it illegal for private citizens to carry guns, there is nothing in the facts

---

[12] Specifically, the Incident Report cites to two statutes: Connecticut General Statutes § 29-38(a) and Connecticut General Statutes § 53a-217(a). *See* Incident Report, Doc. No. 78-1, at 5. The former makes the absence of a permit while possessing a firearm inside a vehicle an element of the offense. The latter prohibits those who have been convicted of a felony from possessing a firearm.

13

of this case to warrant a man 'of prudence and caution' to believe that any offense had been committed merely because respondent had a gun on his person."). More facts were required to rise to the level of probable cause, and the record simply does not establish those facts. *See, e.g., United States v. Black*, 707 F.3d 531 (4th Cir. 2013) ("Being a felon in possession of a firearm is not the default status."). For that reason, the officers did not have probable cause to arrest Mr. Gaskin for unlawful possession of a firearm. Thus, the second search cannot be authorized by the search-incident-to-arrest exception.[13]

Having concluded that none of the exceptions to the warrant requirement apply, the second search was unconstitutional under the Fourth Amendment. Therefore, the contraband found on Mr. Gaskin's person were unlawfully seized.

### 4.    Is suppression required?

A Fourth Amendment violation can trigger the exclusionary rule, which requires courts to suppress illegally obtained evidence. An exception to the exclusionary rule is inevitable discovery, which "allows the government to rely on unlawfully seized evidence if it can prove that it would have inevitably obtained the evidence absent the constitutional violation." *In re 650 Fifth Ave. & Related Properties*, 934 F.3d 147, 164 (2d Cir. 2019). "The [g]overnment's burden is to prove that each event leading to the discovery of the evidence would have occurred with a sufficiently high degree of confidence for the district judge to conclude, by a preponderance of

---

[13]    Technically, there likely was probable cause to arrest Mr. Gaskin based on the traffic violations. In *Atwater v. City of Lago Vista*, 532 U.S. 318, 323 (2001), the Supreme Court held that the Fourth Amendment does not forbid "a warrantless arrest for a minor criminal offense, such as a misdemeanor seatbelt violation punishable only by a fine." That said, some courts have recently noted that a search incident to arrest becomes problematic when, but for the search, there would have been no arrest. *United States v. Davis*, 111 F. Supp. 3d 323, 335 (E.D.N.Y. 2015)*; United States v. Donaldson*, 793 F.2d 498, 503 (2d Cir. 1986) ("To be sure, care must be taken to avoid bootstrapping that allows the fruits of a search incident to an arrest to provide the basis for the arrest.").
    Here, there is nothing in the record to support that Mr. Gaskin would have been arrested for any of the three traffic violations. Therefore, I will not speculate that Mr. Gaskin would have been arrested for one of the traffic infractions. As such, my conclusion remains the same: the second search cannot be justified by the search-incident-to-arrest exception.

the evidence, that the evidence would inevitably have been discovered." *Id.* In cases where the government argues that disputed evidence would inevitably have been discovered during a search incident to arrest, such as here, the government must establish that the arrest would have been valid. *See United States v. Heath*, 455 F.3d 52, 58 (2d Cir. 2006).

It is uncontested that within minutes after the second search, the officers learned that Mr. Gaskin had a prior felony conviction. At that point, there would have been probable cause to arrest him for being in criminal possession of a firearm, in violation of Connecticut General Statutes § 53a-217(a). And Mr. Gaskin was indeed arrested. So even if the unlawful search had not occurred, the contraband would have been retrieved from Mr. Gaskin's person pursuant to a search incident to arrest. Therefore, the inevitable discovery doctrine is applicable, and the contraband previously found by an illegal search should not be suppressed.

For those reasons, the motion to suppress as it relates to the firearm and contraband is **denied**.

B.     Motion to Suppress Statements

Mr. Gaskin also seeks to suppress statements he made in response to the officers' questions in the absence of *Miranda* warnings because he argues that he was in custody within seconds of the police stop. Def. Mot., Doc. No. 78, at 35; *see also Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

The Fifth Amendment provides that "no person … shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Law enforcement must give *Miranda* warnings when a subject is both "in custody" and under "interrogation" by law enforcement. *See Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). It is well settled that if the police subject a suspect to custodial interrogation without informing him of his familiar *Miranda*

rights, his responses cannot be introduced into evidence to establish his guilt. *See Miranda*, 384 U.S. at 444; *United States v. Whitaker*, 827 F. App'x 39, 42 (2d Cir. 2020).

The first question that must be answered is whether Mr. Gaskin was in custody for the purposes of *Miranda* during the stop. The first relevant encounter is between Mr. Gaskin and Officer Barron, in which Officer Barron asks Mr. Gaskin what he has on his person. Subjecting a stopped motorist to a *Terry* frisk does not, by itself, amount to custody. *United States v. Newton*, 369 F.3d 659, 673–74 (2d Cir. 2004). Officer Barron's questions were very limited to the scope of the permissible *Terry*-frisk. As the Second Circuit recently instructed, "the question: 'do you have anything on you?'—while broad enough to elicit information outside of safety concerns—plainly encompasses concerns about officer safety." *Whitaker*, 827 F. App'x at 43. Moreover, the interaction between Officer Barron and Mr. Gaskin lasted only a few seconds. At the time Mr. Gaskin admitted to having a firearm, he was not handcuffed. Taken together, Mr. Gaskin's statement that he possessed a weapon was not made while he was in custody, so that statement is admissible.

Whether Mr. Gaskin was in custody during his encounters with Officers Steinmetz and Spencer presents a closer call. Even if he was in custody, an issue I do not reach here, Mr. Gaskin was not being interrogated. "Custodial interrogation means 'questioning initiated by law enforcement officers after a person has been taken into custody.'" *Illinois v. Perkins*, 496 U.S. 292, 296 (1990) (quoting *Miranda*, 384 U.S. at 444). Spontaneous or volunteered statements are not subject to *Miranda* warnings because they are not deliberately elicited by law enforcement. *See Wolfrath v. LaVallee*, 576 F.2d 965, 973 n.6 (2d Cir. 1978) ("[S]ince the statement which was litigated below was a gratuitously volunteered statement, *Miranda* itself is inapplicable, for spontaneous statements which are not the result of official interrogation have never been subject

to its strictures.") (cleaned up). Officer Steinmetz did not question Mr. Gaskin. Instead, Mr. Gaskin engaged Officer Steinmetz by asking him about the reason for the stop. Mr. Gaskin's subsequent statements to Officer Steinmetz were made spontaneously, thereby insufficient to trigger the *Miranda* protections. Officer Spencer, on the other hand, did engage Mr. Gaskin. Specifically, Officer Spencer asked Mr. Gaskin for his name and inquired if Mr. Gaskin had just done time. But such questioning is akin to general background questioning. The "solicitation of information concerning a person's identity and background does not amount to custodial interrogation prohibited by *Miranda*." *United States v. Adegbite*, 846 F.2d 834, 838–39 (2d Cir. 1988); *see Rosa v. McCray*, 396 F.3d 210, 221 (2d Cir. 2005) ("Whether the information gathered turns out to be incriminating in some respect does not, by itself, alter the general rule that [routine booking] questioning does not fall under the strictures of *Miranda*.").

Taken together, I conclude that Mr. Gaskin was not in custodial interrogation when the challenged statements were made. Therefore, the motion to suppress as it relates to Mr. Gaskin's statements is **denied**.

C.  Motion to Dismiss the Indictment

Finally, Mr. Gaskin seeks to dismiss the indictment because the government did not preserve the Infiniti. *See* Def. Mot., Doc. No. 78, at 31.

A criminal defendant moving for dismissal on the basis of spoliation of the evidence must satisfy two elements: first, "that the evidence possessed exculpatory value that was apparent before it was destroyed"; and second, "that it was of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *United States v. Greenberg*, 835 F.3d 295, 303 (2d Cir. 2016). Additionally, a criminal defendant must also show that the government's failure to preserve the evidence was in bad faith. *Id.*; *see also Arizona v.*

*Youngblood,* 488 U.S. 51, 58 (1988)). Failure to satisfy any of these requirements, including a failure to show the government's bad faith, is fatal to a defendant's spoliation motion.

Assuming *arguendo* that the government should have preserved the vehicle, Mr. Gaskin's motion to dismiss fails because there is simply no evidence to show that the government acted in bad faith. In actuality, the record supports the opposite conclusion; Mr. Gaskin both requested and consented that the vehicle be released to Ms. Lacy. As such, Mr. Gaskin has not established a basis for dismissal of his case. Therefore, his motion to dismiss the indictment is **denied**.

### III.  CONCLUSION

For the foregoing reasons, Mr. Gaskin's motions to suppress and dismiss the indictment, doc. nos. 78, 88, are **denied**.

So ordered

Dated at Bridgeport, Connecticut, this 14th day of June 2023.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge