UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No.   3:22-cr-00098 (SRU) |
| | : | |
| v. | : | |
| | : | |
| CHRISTOPHER GASKIN | : | May 23, 2024 |

## GOVERNMENT'S SENTENCING MEMORANDUM

The Government submits this memorandum in anticipation of Christopher Gaskin's sentencing tomorrow, May 24, 2024, which was scheduled with one day notice, and without time to properly calculate the defendant's sentencing Guidelines range.   Most importantly, the Probation Office has not had time to complete a Presentence Report ("PSR").   Federal Rule of Criminal Procedure 32 and U.S.S.G. §6A1.1 both outline a schedule—including the amount of time that both parties have for notice and objections to a PSR prior to the sentencing of the defendant.[1] Fed. R. Crim. P. R. 32. The local practice in this District is also that the Court and parties are given this information and have time to object . Proceeding in this rushed manner is unfair to both parties and the probation department. The Government has not had an opportunity to digest and evaluate a Presentence Report and to provide additional information for the Court's consideration in calculation of the appropriate sentencing guidelines and the § 3553(a) factors, and

---

[1] The parties were not provided an initial PSR in this matter. The parties received this probation memorandum at approximately 5 p.m. on May 23, 2024 (Doc. No. 160), the evening before a scheduled May 24, 2024 sentencing hearing. Additionally, it was docketed as a PSR, but is a memorandum to the Court and not a complete PSR. Doc. No. 160.

The Government does not have time to properly address and object to the Guidelines' calculation (with which the Government disagrees ), the offense conduct, to address inaccuracies in information provided by the defendant,  or to present evidence to establish an obstruction enhancement. **Moreover, this memorandum does not contain the facts and circumstances of the defendant's underlying criminal history, which is very extensive, complicated, violent and dangerous.** This defendant's criminal history is complicated and needs to be appropriately evaluated. The parties should have the appropriate time to educate the Court on the defendant's complicated history, his dangerous behavior issues and have the ability to argue the appropriate Guidelines range.

the defendant has also not had time to fully present any mitigating circumstances that might be applicable.

While Rule 32 permits sentencing without a PSR if the court finds that the information in the record enables it to meaningfully exercise its discretion under the sentencing statute (and so explains this finding on the record), the probation memorandum that was provided at approximately 5:00 p.m. the night before a 10:00 a.m. sentencing, is incomplete and does not include the underlying facts of the defendant's criminal history including a robbery, multiple assault convictions with a firearm and tampering with a witness during a murder trial. At this point, none of the schedule outlined at Fed. R. Crim. P. R. 32 has been followed and the parties do not have all of the information required to properly weigh the 3553(a) factors or to advocate for an appropriate sentence here. The Court is not in a position, nor are the parties to "meaningfully" make a record as required by Rule 32. Fed. R. Crim. P. R. 32(c)(a)(ii).

In the event the Court decides to proceed without a PSR, it should canvas the defendant on this point and ensure that he is intelligently waiving any right to preparation of a PSR, to have the Court consider information at sentencing not already in the record, or to argue that any sentence he might receive is unlawful due to the absence of a PSR, and that he is waiving the timeframe to obtain this information.

Notwithstanding its participation in sentencing should the court choose to proceed in this fashion, the government reserves its right to challenge the court's procedure and sentence.

The Government is especially concerned with the defendant's danger to the community based on his violent criminal history, his actions over the past year or so in this courtroom – his threatening demeanor, his yelling, words and actions at the suppression hearing, the status conferences, the *Frye* hearing and throughout the trial.

It is imperative that civility be upheld in the Courtroom and a message needs to be clear that the defendant's actions are not appropriate for both specific deterrence and general deterrence reasons. Additionally, the court should weigh Mr. Gaskin's behavior when evaluating the 3553(a) factors as a signal of his continued dangerousness and inability to discontinue his criminal conduct.

The defendant was convicted, after trial, of felon in possession of a firearm. As noted, Mr. Gaskin has a lengthy criminal history which includes multiple convictions related to firearms, the use of firearms during assaults, including an assault in which he shot another person. Yet, he was released from custody and was caught again, in this case, with another loaded firearm.

A significant sentence is appropriate under these circumstances. This is especially true in light of the factors the Court must consider pursuant to 18 U.S.C. § 3553(a) including the nature and seriousness of the offense, history and characteristics of the defendant, just punishment, to promote respect for the law, adequate deterrence and to protect the public from further crimes.

\*\*\*\*\*

Finally, the reason that Probation had not completed the PSR was due to delays in the interview of Mr. Gaskin caused by Mr. Gaskin's own actions when Probation met with him in person and Mr. Gaskin's attorney's assertions that he wanted to provide the defendant's psychiatric history and other information necessary to complete the PSR. In fact, there is a record of emails indicating that the defense planned on seeking an adjournment for sentencing because of these delays. *See* Doc. No. 152.  Once, the request was granted, the defendant got angry and filed a motion for an immediate sentencing without completion of the PSR or sentencing memorandums. Doc. No. 156.

For these reasons the Government seeks an adjournment of the sentencing so that the Court can have context when sentencing the defendant, can properly weigh the section 3553(a) factors

and so that both parties have an opportunity to fully present their arguments. If the Court proceeds with sentencing, the Government believes a ten-year sentence is the only sentence consistent with factors outlined in § 3553(a). Thus, the Government submits that the appropriate sentence is the maximum sentence of 10 years imprisonment plus 3 years of supervised release.

## FACTUAL BACKGROUND

### A.    The Defendant's Offense Conduct

Without a Presentence Report, the Government asks the Court to adopt the facts from the evidence presented during the trial in this matter. What follows is essentially, what was provided to the Probation Office as offense conduct and relevant offense conduct to be considered by the Court. It is repeated herein for ease  of reference.

On January 1, 2022, at approximately 1:15 p.m., Hartford Police Department ("HPD") Officers Matthew Steinmetz, Nicholas Ortiz, and Nikki Iannace were in an unmarked police car on the north side of Hartford. They were part of a Crime Reduction Team, which is a proactive unit tasked to reduce violence and "quality of life" crimes. These officers are normally assigned to the south end of Hartford, but on this day – New Year's Day – they were part of a surge to conduct proactive enforcement on the north end of Hartford as a result of numerous citizen complaints of illegal narcotics sales along with a recent surge in violent crime in that area.

Officer Steinmetz was the driver of the unmarked car, Officer Ortiz was the front seat passenger, and Officer Iannace was seated in the back seat. Each officer wore clearly visible and recognizable HPD uniforms, with police patches, badges, and body worn cameras on their police uniforms. At approximately 1:15 p.m., Officers Steinmetz, Ortiz, and Iannace were on a directed patrol in the area of Magnolia Street north of Albany Avenue. While in that area, Officers Steinmetz and Ortiz, who were seated in the front seats of the vehicle, observed a gray 2001 Infiniti

I30, bearing Connecticut registration AM73274 ("the Infiniti"), stopped along the west curb of Magnolia Street. As the officers traveled south along Magnolia Street, Officers Steinmetz and Ortiz saw the Infiniti abruptly pull off the curb line into the lane of travel. The operator, later identified as Christopher Gaskin, failed to use a turn signal to enter the lane of travel. Officers Steinmetz and Ortiz also noticed that the Infiniti had dark tint material on all windows to the point where they could not see inside the vehicle. Officer Ortiz checked the license plate on the Infiniti 2 and determined that it came back to a different vehicle, namely, a black Mazda and not a gray Infiniti. Officers Steinmetz and Ortiz decided to pull over the Infiniti.

Officer Steinmetz, who was driving the unmarked police car, followed the Infiniti as it turned left onto Albany Avenue and left again onto Irving Street. By that point, Officers Barron and Spencer arrived in a marked police car. Officer Barron engaged the police lights on his vehicle and pulled over the Infiniti in the area of 88 Irving Street. Officer Steinmetz parked his unmarked police vehicle in front of the Infiniti, while Officer Barron parked his marked police vehicle behind the Infiniti. The officers began to exit their vehicles.

As the officers began to exit their vehicles, they noticed that Mr. Gaskin was already exiting the Infiniti before the officers had approached. No officer had given the defendant a command to exit his vehicle. The body camera footage of Officers Steinmetz, Ortiz, and Spencer captured Mr. Gaskin outside his vehicle before the officers approached it. Below is a screen shot from Officer Ortiz's body camera footage showing Mr. Gaskin standing outside his vehicle as Officers Barron and Spencer begin to approach him from their marked squad car behind him and Officer Steinmetz approaches him from his unmarked police car in front of him:



This screen shot also shows the dark tinting on the Infiniti's windows.

According to the police report and the testimony of Officers Steinmetz and Barron, Gaskin appeared nervous and was looking around as if searching for an avenue of escape. Because of that suspicious behavior, Officer Barron began a pat down of Mr. Gaskin's body for the safety of the officers and of the nearby community. Specifically, Officer Barron told the defendant to "put your hands up here" as he touched Mr. Gaskin's right arm and guided it onto the Infiniti. As Officer Barron started the pat down, he asked, "Got anything on you?"  The defendant replied yes, and Officer Barron asked, "What do you got?" Mr. Gaskin responded that he had a gun, and Officer Barron said, "Alright put your hands behind your back. Thank you." When he said that he had a gun, Officers Barron and Steinmetz put handcuffs on Mr. Gaskin so that they could retrieve the gun safely. Officer Barron then asked the defendant, "Where's the gun?" Mr. Gaskin then told Officer Barron that the gun was in his waistband, and Officer Barron retrieved it. Below is a screen

shot from Officer Barron's body camera footage showing him recovering the gun from Mr. Gaskin's waistband at 1:18:22 pm:



When Officer Barron recovered the firearm, he walked away from the defendant, removed the loaded magazine containing five bullets, and he removed a sixth bullet from the chamber. The firearm was an Arcadia Machine & Tool Backup .380 caliber firearm, bearing serial number G14728.

While Officer Barron was making the gun safe, Officer Steinmetz stayed with Gaskin and continued to pat him down. At one point, Mr. Gaskin asked him, "What made you pull me over?" Officer Steinmetz replied, "You didn't use a signal when you pulled out and then…" The rest of Officer Steinmetz's statement is inaudible because of overlapping radio traffic. Mr. Gaskin then twice replied, "I used a signal." Officer Steinmetz asked, "What do you think someone snitched you out?" Mr. Gaskin answered, "I know somebody did. I'm just trying to figure out who." Officer Steinmetz responded, "Nah, nobody did. Hey, nobody did."

While this conversation was occurring, Officer Steinmetz located $105 in the defendant's front pants pocket and his wallet in his back pocket. In his front sweatshirt pocket, Officer Steinmetz found a clear plastic baggie containing a white rock-like substance, and(2) another clear plastic baggie with 35 small purple vials each containing a white rock-like substance. The State of Connecticut lab later tested the drugs recovered from Mr. Gaskin's pocket and confirmed that it was crack cocaine. A retired chemist testified at the trial to this fact.

After the firearm and the crack were recovered, Officer Barron read Mr. Gaskin his *Miranda* rights, he made no substantive post-arrest statements.

### B.          **Guidelines Calculation**

The Government had calculated the defendant's base offense level as 24 because the defendant committed the instant offense subsequent to sustaining at least two felony convictions of a crime of violence, pursuant to Guideline § 2K1.1(a)(2). Specifically, on February 8, 2005, the defendant was convicted of Assault in the First Degree, in violation of C.G.S §53a-59(a)(3), for which he received a sentence of 90 months. The conviction counts because it resulted in the defendant being incarcerated within 15 years of the commencement of the instance offense (1/1/2022). *See* U.S.S.G. § 4A1.2(e)(1). Second, on September 17, 2014, the defendant was convicted of Assault in the Second Degree, in violation of C.G.S §53a-60, for which he received a sentence of one year of imprisonment. The conviction counts because it was imposed within 10 years of the commencement of the instance offense (1/1/2022). *See* U.S.S.G. § 4A1.2(e)(2). The Government recognizes that the subsection of conviction is not listed on the certified transcripts, but even if the Court does not count them in the Guidelines' calculation, Mr. Gaskin's prior criminal history should provide a basis for varying upwards.

The base offense level is increased by two levels because the firearm was stolen, pursuant

to Guideline § 2K2.1(b)(4). Specifically, the firearm was registered to Andres Vasquez. After the firearm was recovered from Mr. Gaskin, law enforcement interviewed Vasquez, who stated that the firearm had been stolen. The base offense level was increased by four levels because the firearm was possessed with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense, pursuant to Guideline § 2K2.1(b)(6)(B) and Application Note 14(B) ("firearm is found in close proximity to drugs").

The base offense level should further be increased by two levels because Mr. Gaskin attempted to obstruct justice with respect to the prosecution of the instant offense, pursuant to Guideline § 3C1.1. Specifically, Mr. Gaskin engaged in "threatening, intimidating, or otherwise unlawfully influencing a . . . witness . . . or attempting to do so." Application Note 4(A). On the first day of trial, while Officer Steinmetz was on the witness stand and waiting for the jury to return after a break in his testimony, the defendant threatened Officer Steinmetz by saying words to the effect of, "You are nothing without your badge and your gun. I will chew you up and spit you out." The Government attorney objected and stated that Mr. Gaskin was threatening the witness, and Mr. Gaskin turned his attention to the prosecutor and told her to "sit down because men were talking here."

**Additional Information that the Court should consider when weighing the §3553(a) factors**

There is further additional information that provides a basis for varying above the Guidelines. On at least two occasions, Mr. Gaskin threatened to harm deputies with the United States Marshals Service. First, on September 7, 2023, the defendant was scheduled for a *Frye* hearing. On the day of the hearing, Mr. Gaskin refused to come to Court. When  this Court took the bench, the attorneys were advised that Mr. Gaskin had threatened to physically fight them if they attempted to bring him to Court.  Second, shortly before trial began, Mr. Gaskin made it

known to the Court that he would refuse to attend his trial, and the Court ordered the U.S. Marshals to use force, if necessary, to bring him to Court. In response to that order, on February 23, 2024, Mr. Gaskin submitted a handwritten "Sworn Affidavit" stating, in part, "Should Judge Underhill Continue to Instruct U.S. Marshalls [sic] to Assault Me & Exceed Their Jurisdiction & Enter a State Facility & Physically Extract Me From the Confines of My Prison Cell, I Shall defend My Position By Any & All Means Available to me Unto the Cause of Death!!!" Doc No. 133-1.

Additionally, the Court should consider the pretrial release violations outlined in the probation memorandum as they are further indicators of his continual dangerous temperament.

## DISCUSSION

Following the Supreme Court's holding in *United States v. Booker*, 543 U.S. 220, 243-245 (2005), which rendered the Sentencing Guidelines advisory rather than mandatory, a sentencing judge is required to: "(1) calculate[] the relevant Guidelines range, including any applicable departure under the Guidelines system; (2) consider[] the Guidelines range, along with the other § 3553(a) factors; and (3) impose[] a reasonable sentence." *See United States v. Fernandez*, 443 F.3d 19, 26 (2d Cir. 2006). The § 3553(a) factors include: (1) "the nature and circumstances of the offense and history and characteristics of the defendant;" (2) the need for the sentence to serve various goals of the criminal justice system, including (a) "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment," (b) to accomplish specific and general deterrence, (c) to protect the public from the defendant, and (d) "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;" (3) the kinds of sentences available; (4) the sentencing range set forth in the guidelines; (5) policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to victims. *See* 18 U.S.C.

§ 3553(a).

The Second Circuit reviews a sentence for reasonableness. *United States v. Canova*, 412 F.3d 331, 350 (2d Cir. 2005). The reasonableness standard is deferential and focuses "primarily on the sentencing court's compliance with its statutory obligation to consider the factors detailed in 18 U.S.C. § 3553(a)." *Id*. Here, all of the relevant factors weigh in favor of a significant sentence above the Guidelines range once we have a proper calculation. *See* 18 U.S.C. § 3553(a).

The defendant stands before the court, at the age of 48 years old, having committed yet another crime. It does not appear that he is aging out of his criminal conduct and in fact, at every turn, he has demonstrated to this Court that he is a continued danger to society. His history is fraught with continually disrespecting the law, violating conditions of release and pretrial release (as outlined at page 1-3 of the probation memorandum), and continually committing criminal activity. *See*, Doc. No. 160 at 1- 3, and 8.

There is no evidence of any rehabilitation by the defendant. In fact, he denies he has a problem, told the magistrate judge he did not need help and never used hard drugs, and threatened workers when given a chance on pretrial release. The defendant is a clear danger to society, has demonstrated that he cannot control himself, he continues to make the choice to commit crimes even when given chances in the past to return to society. His answer to those chances was to get another firearm and carry it around loaded while in possession of crack cocaine.

It is clear that the defendant's history and characteristics are such that his continued criminal behavior is not an anomaly and is very consistent with his past behavior. He was previously given chances at rehabilitation and a chance to change and he continuously chose to perpetuate his criminal activity. He previously violated his pretrial release, committed crimes while in prison, was kicked out of pretrial detention at the Donald W. Wyatt facility for his

disciplinary behavior, and he has a history of noncompliance – assaulting inmates and a disciplinary record while in custody. He has repeated violations of serious assaults with a firearm and then being convicted again in federal court for possession of firearm suggest strongly that an offender will continue on that path, thereby justifying a lengthier sentence. There is no evidence currently before the Court that mitigates this in any way.

As the record stands, the history and characteristics of the defendant, the seriousness of his offense conduct, and the need for deterrence and the protection of the public, justify a substantial prison term.  The record before this Court is especially clear with regard to the dangerousness of Mr. Gaskin and the Court needs to protect the public from Mr. Gaskin.

In the Government's view, in light of all the 3553(a) factors--and in particular, Mr. Gaskin's repeated demonstration of his belief that he is above the law to this Court and repeated turn to firearms and drugs—a significant sentence of ten years is the only appropriate sentence.  It appropriately and reasonably balances all of the sentencing factors and is sufficient but not greater than necessary to achieve all of the purposes of sentencing--especially to protect the community from the defendant.

Respectfully submitted,

VANESSA ROBERTS AVERY
UNITED STATES ATTORNEY

*/s/ Patricia Stolfi Collins*
PATRICIA STOLFI COLLINS
ASSISTANT U.S. ATTORNEY
Federal Bar No. phv08052
1000 Lafayette Circle, #10
Bridgeport, CT 06604
Email: Patricia.Stolfi.Collins@usdoj.gov
Phone: 203-696-3000

<u>CERTIFICATION OF SERVICE</u>

This is to certify that on May 23, 2024, a copy of the foregoing Response was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


*/s/ Patricia Stolfi Collins*
PATRICIA STOLFI COLLINS
ASSISTANT U.S. ATTORNEY